Judge SACK concurs in part and dissents in part in a separate opinion.
JOSÉ A. CABRANES, Circuit Judge:
On September 26, 2002, plaintiff-appellant Maher Arar, a dual citizen of Syria and Canada, and the subject of a U.S. government “lookout,” J.A. 88, was detained by U.S. authorities at John F. Kennedy International airport in New York City (“JFK Airport”) while en route from Tunisia to Montreal. On October 7, 2002, J. Scott Blackman, then the U.S. Immigration and Naturalization Service (“INS”) Regional Director for the Eastern Region, determined, based on a review of classified and unclassified information, that Arar was a member of A1 Qaeda and therefore inadmissible to the United States. Pursuant to this determination, Blackman signed an order authorizing Arar to be removed to Syria “without further inquiry before an immigration judge, in accordance with [8 U.S.C. § 1225(c)(2)(B) and 8 C.F.R. § 235.8(b)].” Id. at 86.
In February 2004, the Canadian Government convened an official commission (“the Commission”) to look into “the actions of Canadian officials in relation to” Arar’s detention in the United States, his eventual removal to Syria, and his subsequent detention by Syrian authorities. See Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Analysis and Recommendations 11-12 (2006) (“Canadian Commission, Analysis and Recommendations”) (describing the scope of the inquiry). The Commission determined that Canadian officials had “requested” that American authorities create lookouts for Arar and his wife, had described Arar to American authorities as an “Islamic Extremist individual!] suspected of being linked to the A1 Qaeda terrorist movement,” and had provided American authorities with information derived from their investigations of Arar. Id. at 13. The Commission further determined that “[i]t [wa]s very likely that, in making the decisions to detain and remove Mr. Arar, American authorities relied on information about Mr. Arar provided by the [Royal Canadian Mounted Police].” Id. at 14. Accordingly, the Commission recommended that Canadian authorities consider granting Arar’s request for compensation from the Canadian government. Id. at 369. In January 2007, the Canadian government entered into a settlement agreement with Arar, whereby he received compensation of 11.5 million Canadian dollars (approximately $9.75 million, at the time) in exchange for withdrawing a lawsuit against the Canadian government. See Ian Austen, Canada Will Pay $9.75 Million to Man Sent to Syria and Tortured, N.Y. Times, Jan. 27, 2007, at A5.[1]
On January 22, 2004, shortly before the initiation of the Canadian inquiry, Arar filed this civil action against Blackman, former U.S. Attorney General John Ashcroft, FBI Director Robert Mueller, former Acting Attorney General Larry D. Thompson, former INS Commissioner James W. Ziglar, INS District Director Edward J. McElroy, the Secretary of Homeland Security, the Regional Director *163 of Immigration and Customs Enforcement for the New York Region, and several unnamed employees of the FBI and INS.[2] Arar alleges that these individuals mistreated him while he was in the United States and then removed him to Syria with the knowledge or intention that he would be detained and tortured there.
Count one of Arar’s complaint requests relief under the Torture Victim Protection Act, 28 U.S.C. § 1850 note (“TVPA”). Counts two and three request relief under the Fifth Amendment to the U.S. Constitution for Arar’s alleged torture (Count two) and detention (Count three) in Syria. Count four requests relief under the Fifth Amendment to the U.S. Constitution for events alleged to have occurred while Arar was detained in the United States. With respect to relief, Arar seeks a declaratory judgment that defendants’ conduct violated his “constitutional, civil, and international human rights,” as well as compensatory and punitive damages for the statutory and constitutional violations alleged in the complaint. Compl. 24.
In a memorandum and order dated February 16, 2006, the United States District Court for the Eastern District of New York (David G. Trager, Judge) dismissed Counts one through three of Arar’s suit, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted. See Arar v. Ashcroft, 414 F.Supp.2d 250, 287-88 (E.D.N.Y.2006). The District Court dismissed Count four without prejudice, pursuant to Rule 12(b)(2), for lack of personal jurisdiction over the individual defendants. Upon receiving notice that Arar had elected not to amend his complaint to cure the jurisdictional defects found by the District Court, the Clerk of Court entered judgment dismissing the action with prejudice on August 17, 2006. Arar now brings this appeal.
Arar’s suit implicates several questions of first impression for our Court. One threshold question presented on this appeal is whether, as defendants contend, the Immigration and Nationality Act (“INA”), 8 U.S.C. § 1101 et seq., deprived the District Court of subject matter jurisdiction over the claims raised in Counts two and three of Arar’s complaint. The adjudication of this question is, for the reasons set forth below, see infra at 169-73, particularly difficult in light of the record before us. However, because we are compelled to dismiss these claims on the basis of other threshold — that is, non-merits — grounds, we need not determine whether the INA did, in fact, strip the District Court of subject matter jurisdiction to hear Arar’s removal-related claims.
We must therefore determine (1) whether the district court had personal jurisdiction over the individual defendants; (2) whether Arar’s allegation that U.S. officials conspired with Syrian authorities to torture him states a claim against the U.S. officials under the TVPA; (3) whether to create a judicial damages remedy, pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for Arar’s claims that U.S. officials (a) removed him to Syria with the knowledge or intention that he would be detained and tortured there and (b) mistreated him while he was detained in the United States; and finally, (4) whether Arar may seek a declaratory judgment that defendants’ actions violated his constitutional rights.
For the reasons that follow, we conclude that under the precedents of the Supreme Court and our Court: (1) Arar has made a *164 prima fade showing sufficient to establish personal jurisdiction over Thompson, Ashcroft, and Mueller at this early stage of the litigation; (2) Count one of Arar’s complaint must be dismissed because Arar’s allegations regarding his removal to Syria do not state a claim against defendants under the TVPA; (3) Counts two and three of Arar’s complaint, which envisage the judicial creation of a cause of action pursuant to the doctrine of Bivens, must also be dismissed because (a) the remedial scheme established by Congress is sufficient to cause us to refrain from creating a free standing damages remedy for Arar’s removal-related claims; and (b) assuming for the sake of the argument that the existence of a remedial scheme established by Congress was insufficient to convince us, “special factors” of the kind identified by the Supreme Court in its Bivens jurisprudence counsel against the judicial creation of a damages remedy for claims arising from Arar’s removal to Syria; (4) Count four of Arar’s complaint must be dismissed because Arar’s allegations about the mistreatment he suffered while in the United States do not state a claim against defendants under the Due Process Clause of the Fifth Amendment; and (5) Arar has not adequately established federal subject matter jurisdiction over his request for a judgment declaring that defendants acted illegally by removing him to Syria so that Syrian authorities could interrogate him under torture.
In the circumstances presented, we need not consider the issues raised by the assertion of the state-secrets privilege by the United States — particularly, whether the exclusion of information pursuant to the privilege might result in the dismissal of certain of Arar’s claims.
We do not doubt that if Congress were so inclined, it could exercise its powers under the Constitution to authorize a cause of action for money damages to redress the type of claims asserted by Arar in this action. The fact remains, however, that Congress has not done so. Instead, it has chosen to establish a remedial process that does not include a cause of action for damages against U.S. officials for injuries arising from the exercise of their discretionary authority to remove inadmissible aliens. We are not free to be indifferent to the determinations of Congress, or to ignore the Supreme Court’s instructions to exercise great caution when considering whether to devise new and heretofore unknown, causes of action.
Judge Sack concurs in part and dissents in part. Specifically, Judge Sack agrees with the majority that (1) Arar has made a prima fade showing sufficient to establish personal jurisdiction over Thompson, Ashcroft, and Mueller; (2) Arar’s allegations regarding his removal to Syria do not state a claim against defendants under the TVPA; and (3) Arar has not adequately established federal subject matter jurisdiction over his request for a judgment declaring that defendants acted illegally by removing him to Syria so that Syrian authorities could interrogate him under torture.
Unlike the majority, however, Judge Sack would accept Arar’s invitation to judicially create a new Bivens remedy and would permit Arar’s claims for monetary damages to go forward based on his view that (1) the context giving rise to Counts two and three of Arar’s complaint — -the detention and deportation of a suspected terrorist pursuant to the discretion conferred on the Attorney General' — raises no “ ‘special factors’ counseling] against the application of Bivens,” see Dissent 212; and (2) the constitutional rights that Arar’s complaint invokes are sufficiently broad and “clear” that Arar may state a Bivens claim based on the conditions of his deten *165 tion within the United States, see id. at 215. The analysis by which Judge Sack reaches these conclusions is, in our view, undermined by contradictory assertions and misstatements of the law. We highlight three prominent examples here. First, Judge Sack’s opinion does not grapple with the complicated legal questions arising from the extraterritorial application of the U.S. Constitution: it casts the challenged actions “as perpetrated by U.S. agents entirely within the United States,” id. at 213-14 n. 33, but then looks to Arar’s alleged torture by Syrian anthmities in Syria as the basis for Arar’s Fifth Amendment claim, id. at 204-05 (observing that “interrogation by torture” undoubtedly “shocks the conscience” and that “whether the defendants violated Arar’s Fifth Amendment rights” does not turn on who Arar claims committed the torture or where Arar claims the torture took place). Second, despite recognizing that Arar’s Fifth Amendment claim is based on allegations that Arar was removed from the United States in order to be tortured in Syria, Judge Sack nevertheless concludes that Arar’s suit involves no “questions of law and fact ... arising from any action taken or proceeding brought to remove an alien from the United States,” 8 U.S.C. § 1252(b)(9) (emphasis added) — thereby avoiding the difficult question of whether § 1252(b)(9) stripped the District Court of subject matter jurisdiction to hear Arar’s removal-related claims. See Dissent 212 n. 31. Third, Judge Sack takes the position that “[t]he assessment of Arar’s alleged complaint must take into account the entire arc of factual allegations that Arar makes,” id. at 204, but criticizes the majority for considering, when evaluating Arar’s Bivens claim, “the fact-specific ‘context’ of Arar’s treatment,” id. at 209.
Such is the freedom enjoyed by the writer of a dissenting opinion. Those charged with rendering decisions that carry the force of law have no such freedom, however. Our task is to deliver a reasoned opinion that conforms to the precedents of the Supreme Court and our Court; we have done so here. We agree, of course, with Judge Sack’s view that threats to the nation’s security do not allow us to jettison principles of “simple justice and fair dealing.” Id. at 216. But these parlous times of national challenge can no more expand the powers of the judiciary than they can contract the rights of individuals. The creation of civil damage claims is quintessentially a legislative function, and the protection of national security and the conduct of foreign affairs are primarily executive. Whatever the emotive force of the dissent’s characterization of the complaint, we cannot disfigure the judicial function to satisfy personal indignation.
I. Background
A. Facts alleged
Arar’s complaint, which is unverified,[3] sets forth the following relevant factual allegations. On September 26, 2002, U.S. immigration officials detained Arar at JFK Airport while he was transferring flights on his way from Tunisia to Montreal. He remained in U.S. custody for twelve days. For most of this time, he was held at the Metropolitan Detention Center (“MDC”) in Brooklyn', NY. Arar claims that on the evening of September 26, he was “placed *166 in solitary confinement” in a room with no bed and with lights that were left on all night. Compl. ¶ 32. On the morning of September 27, he was allegedly questioned by FBI agents who ignored his requests to see a lawyer or make a telephone call. Arar alleges that his requests to see a lawyer or make a telephone call were also ignored between September 27 and October 1.
On October 1, Arar was presented with a document stating that the INS had determined that he was a member of A1 Qaeda and was therefore inadmissible to the United States; he was then permitted to make a telephone call to his family, who retained a lawyer on his behalf. The complaint further alleges that Arar met his lawyer at the MDC on the evening of October 5; that, after this meeting, on the evening of Sunday, October 6, defendant McElroy left a message notifying Arar’s lawyer that the INS wished to question Arar further; that INS officials then immediately proceeded to question Arar, having falsely told him that his lawyer had chosen not to be present; that, on the following day, INS officials falsely informed Arar’s lawyer that Arar had been transferred from the MDC to an unidentified detention facility in New Jersey when, in fact, Arar was still being held at the MDC; and that on October 8, defendant Thompson signed an order authorizing Arar’s removal.
The complaint further alleges that, although Arar had designated Canada as the country to which he wished to be removed, on October 8, 2002, U.S. officials caused him to be transported from the MDC to New Jersey, where he was flown to Washington D.C.; and from Washington D.C. to Amman, Jordan, where Jordanian authorities turned him over to Syrian military officials. Syrian authorities allegedly kept Arar in custody for approximately twelve months; initially subjected him to “physical and psychological torture” — including regular beatings and threats of severe physical harm; and confined him throughout this time in an underground cell six feet long, seven feet high, and three feet wide. Id. ¶¶ 51-58.
Arar alleges, “[o]n information and belief,” that he was removed to Syria pursuant to the U.S. government’s “extraordinary rendition” policy, with the knowledge or intention that Syrian officials would extract information from him through torture. Id. ¶ 57. He further alleges, “[o]n information and belief,” that defendants provided Syrian authorities with information about him, suggested subjects for Syrian authorities to interrogate him about, and received “all information coerced from [him] during [these] interrogations.” Id. ¶¶ 55-56. Thompson, “as Acting Attorney General,” is alleged “[o]n information and belief’ to have signed the order authorizing Arar’s removal to Syria. Id. ¶ 48.
B. Procedural history
On January 24, 2005, the United States formally asserted the state-secrets privilege over information relating to Counts one through three of Arar’s complaint. Specifically, the United States explained:
Litigating [Arar’s claims] would necessitate disclosure of classified information, including: (1) the basis for the decision to exclude [Arar] from [the United States] based on the finding that [he] was a member of ... al Qaeda ...; (2) the basis for the rejection of [Arar’s] designation of Canada as the country to which [he] wished to be removed ...; and (3) the considerations involved in the decision to remove [Arar] to Syria.
J.A. 131-32, 135-36. Shortly thereafter, all defendants moved to dismiss Arar’s claims against them. They contended, among other things, that Counts one *167 through three of Arar’s complaint should be dismissed because the assertion of the state-secrets privilege by the United States prevented them from introducing evidence required to present a meaningful defense.[4] Blackman, Ziglar, McElroy, Thompson, Ashcroft, and Mueller further contended that Arar had not alleged sufficient personal involvement to state a claim against them in their individual capacities. Thompson, Ashcroft, and Mueller contended, moreover, that they were not subject to personal jurisdiction in New York.
In a memorandum and order filed on February 16, 2006, the District Court, without reaching the issues raised by the assertion of the state-secrets privilege by the United States, dismissed Counts one through three of Arar’s complaint with prejudice and Count four without prejudice. With respect to Count one, the District Court concluded that Arar’s allegations did not state a claim against defendants under the TVPA. See 414 F.Supp.2d at 287. With respect to Counts two and three, it concluded that “special factors” of the kind identified by the Supreme Court counseled against the extension of a Bivens remedy, under the Fifth Amendment, for Arar’s alleged injuries. Id. at 281-83. With respect to Count four, involving Arar’s allegations about mistreatment while in U.S. custody, the District Court determined that Arar had stated a claim under the Fifth Amendment, id. at 286, that defendants were not entitled to qualified immunity, id. at 286, but that Arar had not alleged sufficient personal involvement by the defendant officials to sue them in their individual capacities — let alone to establish personal jurisdiction over those defendants domiciled outside New York, id. Arar declined to replead Count four of his complaint. Accordingly, on August 17, 2006, the Clerk of Court entered a final judgment dismissing Arar’s complaint with prejudice. This timely appeal followed.
On October 23, we directed the parties to submit letter briefs on the question of “whether, and to what extent, the assertion of the state-secrets privilege by the United States could foreclose our ability to adjudicate claims arising from Counts one through three of the complaint.” The United States, in its letter brief, maintained that “[t]his Court can and should affirm the [District [CJourt’s judgment without reaching the [issues raised by the United States’s assertion of the] state-secrets privilege,” U.S. Letter Br. 8; but that, “if this Court were to reverse the dismissal of claims 1, 2, or 3, the [District [C]ourt would then be required to determine on remand whether any reinstated claim could proceed notwithstanding the assertion of the state-secrets privilege,” id. (internal quotation marks omitted). Arar, in his letter brief, “agree[d] with the United States that this Court can and should resolve the pending appeal without considering the state[-]secrets privilege,” Pi’s Letter Br. 1, on the understanding that, if he prevailed in our Court, the District Court could conduct the necessary “case-specific inquiries [regarding the state-secrets privilege] ... on remand,” id. at 5.
*168 Therefore, with the agreement of the parties, we evaluate the claims presented under applicable law before considering whether the assertion of the state-secrets privilege by the United States requires dismissal of this action.
II. Discussion
We review de novo a district court’s grant of a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim. See, e.g., In re NYSE Specialists Securities Litigation, 503 F.3d 89, 95 (2d Cir.2007). In doing so, we “accept[] as true the material facts alleged in the complaint and draw[ ] all reasonable inferences in [the] plaintiff[’s] favor.” See Iqbal v. Hasty, 490 F.3d 143, 152 (2d Cir.2007) (internal quotation marks omitted), cert. granted sub nom., Ashcroft v. Iqbal, — U.S. -, 128 S.Ct. 2931, — L.Ed.2d -, 76 U.S.L.W. 3417, 2008 WL 336310 (U.S. June 16, 2008) (No. 07-1015). Defendants also challenged, pursuant to Rule 12(b)(1), the District Court’s subject matter jurisdiction over Arar’s removal-related claims and, pursuant to Rule 12(b)(2), its personal jurisdiction over Ashcroft, Thompson and Mueller. We begin our analysis with a consideration of these threshold issues.
A. Subject matter jurisdiction
A federal court has subject matter jurisdiction over a cause of action only when it “has authority to adjudicate the cause” pressed in the complaint. Sinochem Int’l Co. v. Malay. Int’l Shipping Corp., — U.S. -, 127 S.Ct. 1184, 1188, 167 L.Ed.2d 15 (2007). Determining the existence of subject matter jurisdiction is a threshold inquiry, see id., and a claim is “properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it,” Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000). When jurisdiction is challenged, the plaintiff “bears the burden of showing by a preponderance of the evidence that subject matter jurisdiction exists,” APWU v. Potter, 343 F.3d 619, 623 (2d Cir.2003) (internal quotation marks omitted); see also Aurecchione v. Schoolman Transp. Sys., 426 F.3d 635, 639 (2d Cir.2005), and the district court may examine evidence outside of the pleadings to make this determination, see Makarova, 201 F.3d at 113. Accordingly, “ ‘[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.’ ” Potter, 343 F.3d at 623 (quoting Shopping Fin. Servs. Corp v. Drakos, 140 F.3d 129, 131 (2d Cir.1998)).[5] When considering a district court’s adjudication of such a motion, we review its factual findings for clear error and its legal conclusions de novo. See id. at 623-24; Aurecchione, 426 F.3d at 638.
Defendants challenge, on statutory grounds, the District Court’s subject matter jurisdiction over Counts two and three of Arar’s complaint — the Bivens claims arising from his overseas detention and alleged torture.[6] Specifically, they contend that Congress (1) explicitly foreclosed judicial review of the Attorney General’s discretionary decisions when carrying out removal-related duties and (2) created an alternative forum to litigate other removal- *169 related claims, thereby excepting them from the federal question jurisdiction of the district courts. Arar responds that his attempts to avail himself of that alternative forum were thwarted by defendants and that if he is unable to litigate this action in federal district court, he will have no forum whatsoever to press his constitutional claims.
The Supreme Court has observed that construing a statute to “preclude judicial consideration ... of ... an important question of law ... would raise serious constitutional questions.” INS v. St. Cyr, 533 U.S. 289, 314, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (offering this observation in the context of a petition for writ of habeas corpus); see also Webster v. Doe, 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (noting that a “ ‘serious constitutional question’ ... would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim” (quoting Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 681 & n. 12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986))); Calcano Martinez, 232 F.3d at 340. Accordingly, “where Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear.” Webster, 486 U.S. at 603, 108 S.Ct. 2047 (noting, with approval, the Court’s earlier observations to this effect in Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) and Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974)).
(1)
As an initial matter, defendants question whether any federal court has jurisdiction to review these Bivens claims, noting that the INA affords the Attorney General and his delegates discretion to send a removable alien to a country other than the country he has designated, 8 U.S.C. § 1231(b)(2)(C),[7] and insulates from review actions taken pursuant to that discretionary authority, id. § 1252(a)(2)(B)(ii).[8] See, e.g., Ashcroft Br. 23-25 (invoking 8 U.S.C. § 1231(b)(2)(C) and § 1252(a)(2)(B)(ii) in support of the proposition that “insofar as Arar complains about not being sent to his preferred designations or about the determination as to membership in a terrorist organization, Congress has foreclosed any judicial review”).
Congress has indeed declined to vest the federal courts with jurisdiction to review discretionary decisions of the Attorney General other than the granting or denial of asylum. See 8 U.S.C. § 1252(a)(2)(B)(ii); Camara v. Dep’t of Homeland Sec., 497 F.3d 121, 124 (2d Cir.2007); Atsilov v. Gonzales, 468 F.3d 112, 115 (2d Cir.2006) (noting that the INA “negates our jurisdiction to review a ‘decision or action of the Attorney General ... the authority for which is specified ... to be in the discretion of the Attorney General’ ” (quoting 8 U.S.C. § 1252(a)(2)(B)(ii)) (first alteration in original)). Congress has, however, in 8 U.S.C. § 1252(a)(2)(D), authorized the “appropriate court of ap *170 peals” to consider “constitutional claims or questions of law raised upon a petition for review filed ... in accordance with [the judicial review provisions of the INA].” See, e.g., Xiao Ji Chen v. U.S. Dept. of Justice, 471 F.3d 315, 329 (2d Cir.2006). This provision indicates that Congress did not intend to preclude our consideration of removal-related claims that raise questions of law or allege constitutional violations, so long as they are properly before this Court.
(2)
As a secondary matter, defendants contend that, even if Arar has raised constitutional claims, such claims were not properly before the District Court; and therefore, are not properly before us on appeal. Specifically, they assert that INA places removal-related claims beyond the reach of a district court’s federal question jurisdiction by creating an alternative— and exclusive — mechanism for resolving those claims.[9] Pursuant to 8 U.S.C. § 1252(b)(9), “all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States” are channeled into a judicial review scheme providing that “a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal,” 8 U.S.C. § 1252(a)(5). See also id. § 1231 note (providing for claims relating to the “involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture” to be brought under the judicial review scheme established by section 1252); Calcano Martinez v. INS., 232 F.3d 328, 340 (2d Cir.2000) (noting that the judicial review provisions of the INA provide for “exclusive appellate court” jurisdiction over removal-related claims). Defendants urge that Arar’s Bivens claims related to his alleged detention and torture in Syria “aris[e] from [the] action taken ... to remove [Arar] from the United States,” 8 U.S.C. § 1252(b)(9), and therefore can be reviewed only by petition to the appropriate court of appeals — not by a federal district court.
Federal district courts, like other Article III courts, are “courts of limited jurisdiction ... [that] possess only that power authorized by [the] Constitution and statute.” Exxon Mobil Corp. v. Allapattah Servs., 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (internal quotation marks omitted). We have previously observed that “statutes ... that vest judicial review of administrative orders exclusively in the courts of appeals also preclude district courts from hearing claims that are ‘inextricably intertwined’ with review of such orders.” Merritt v. Shuttle, Inc. 245 F.3d 182, 187 (2d Cir.2001). In doing so, however, we have noted that “the test for determining whether [a statute vesting exclusive jurisdiction in the courts of appeals] precludes a district court from hearing a particular claim is ... whether the claim ‘could and should have been’ presented to and decided by a court of appeals.” Id. at 188 (quoting City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 339, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958)).
Arar contends that he could not have presented his claims through the proee- *171 dure set forth in section 1252. He alleges that defendants intentionally prevented him from pursuing the INA’s judicial review provisions by denying him access to counsel, concealing his location from his lawyer, and removing him, in secret, before his lawyer could file a petition with our Court. While we are not obliged to assume the truth of these allegations when evaluating whether a claim should be dismissed for lack of subject matter jurisdiction, see Makarova, 201 F.3d at 113, we will do so here for the sole purpose of considering whether Arar’s allegations, if true, would compel a determination that the District Court had subject matter jurisdiction.
There is authority for the proposition that official obstruction similar to that alleged by Arar may (1) excuse a plaintiffs failure to comply with a filing deadline, see, e.g., Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir.1994) (equitable tolling), or (2) bar a defendant from asserting certain defenses, such as failure to exhaust administrative remedies, see, e.g., Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir.2004) (equitable estoppel). However, Arar has set forth no authority — and we are aware of none — for the proposition that allegations of past interference permit a plaintiff to avoid a con-gressionally mandated remedial scheme altogether. In other words, it appears that no court has yet considered whether official misconduct of the sort alleged by Arar may vitiate Congress’s determination that a federal district court is not the appropriate forum for litigating claims arising from an order of removal.
That we are asked to decide this issue on the basis of allegations set forth in an unverified complaint heightens our hesitation. While a verified complaint made “under oath about a matter within [the plaintiffs] knowledge,” Doral Produce Corp. v. Paul Steinberg Assoc., 347 F.3d 36, 39 (2d Cir.2003), constitutes evidence in support of the facts alleged in the complaint, see Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir.1995), “[a]n ordinary or unverified complaint,” such as the one filed by Arar in this litigation, “may not constitute [such] evidence,” 11 James Wm. Moore et al., Moore’s Federal Practice § 56.14 (3d ed.2007). Permitting a plaintiff to circumvent a congressionally mandated remedial scheme by alleging in an unverified complaint — perhaps on nothing more than information and belief — that government officials blocked access to the relevant forum would permit widespread evasion of the administrative mechanisms that Congress has established for challenging agency action: mechanisms that include judicial review by the court of appeals. It is, after all, the prerogative of Congress to determine the jurisdiction of the district courts, and we are loath to permit those determinations to be so easily thwarted.[10]
*172 (3)
Because we affirm the District Court’s dismissal of Counts two and three of Arar’s complaint on the basis that a judicial damages remedy is not authorized by Bivens and its progeny, infra 180-84, we need not determine whether the INA deprived the District Court of subject matter jurisdiction over Arar’s removal-related Bivens claims.
The Supreme Court has, on several occasions, recognized that “a federal court has leeway ‘to choose among threshold grounds for denying audience to a case on the merits.’ ” Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping, — U.S. -, 127 S.Ct. 1184, 1191, 167 L.Ed.2d 15 (2007) (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999)). As the Court has explained: “Jurisdiction is vital only if the court proposes to issue a judgment on the merits.” Id. at 1191-92 (internal quotation marks and brackets omitted). Accordingly, a federal court “that dismisses on ... non-merits grounds ... before finding subject-matter jurisdiction ] makes no assumption of law-declaring power that violates ... separation of powers principles.” Ruhrgas AG, 526 U.S. at 584, 119 S.Ct. 1563 (internal quotation marks omitted); see also id. at 585, 119 S.Ct. 1563 (noting that “district courts do not overstep Article III limits when they decline jurisdiction of state-law claims on discretionary grounds without determining whether those claims fall within their pendent jurisdiction, see Moor v. County of Alameda, 411 U.S. 693, [715-16], 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), or abstain under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), without deciding whether the parties present a case or controversy, see Ellis v. Dyson, 421 U.S. 426, [433-34], 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975)”).
In Tenet v. Doe, 544 U.S. 1, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005), the Court held that it could dismiss a suit pursuant to Totten v. United States, 92 U.S. 105, 23 L.Ed. 605 (1876) (precluding suits arising from a secret espionage agreement between the plaintiff and the United States), without first determining whether the district court had subject matter jurisdiction over the claims in question. See Tenet, 544 U.S. at 6-7 n. 4. The Court reasoned that the issue of whether to entertain the plaintiffs’ claim was, like Younger abstention or prudential standing, “the sort of ‘threshold question ... [that] may be resolved before addressing jurisdiction.’ ” Id. The Court also observed that “[i]t would be inconsistent with the unique and categorical nature of ... a rule designed not merely to defeat the asserted claims, but to preclude judicial inquiry — to first allow discovery or other proceedings in order to resolve the jurisdictional question.” Id.
Whether Arar’s suit was appropriately before the District Court undeniably raises complicated questions of law. In addition, we have concluded that, in light of the Supreme Court’s Bivens jurisprudence, we are required to dismiss Counts two and three of Arar’s complaint as a threshold matter, without considering the merits of the claims raised in those counts. See *173 infra, 180-81. Accordingly, we need not decide whether the INA 'placed Arar’s removal-related Bivens claims beyond the reach of the District Court’s general federal question jurisdiction. Cf. Sinochem, 127 S.Ct. at 1194 (“If ... a court can readily determine that it lacks jurisdiction over the cause or the defendant, the proper course would be to dismiss on that ground.... But where ... jurisdiction is difficult to determine, and [other] considerations weigh heavily in favor of dismissal, the court properly takes the less burdensome course. ”).
B. Personal jurisdiction over Ashcroft, Thompson, and Mueller
The requirement that federal courts have personal jurisdiction over the litigants before them arises from “an individual’s liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful ‘contacts, ties, or relations.’ ” Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting Int’l Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). “In order to survive a motion to dismiss for lack of personal jurisdiction [pursuant to Rule 12(b)(2)], a plaintiff must make a prima facie showing that jurisdiction exists.” Thomas v. Ashcroft, 470 F.3d 491, 495 (2d Cir.2006). A federal court’s jurisdiction over non-resident defendants is governed by the law of the state in which the court sits — including that state’s long-arm statute — to the extent this law comports with the requirements of due process. See Henderson v. INS, 157 F.3d 106, 123 (2d Cir.1998). Under New York’s long-arm statute, “a court may exercise jurisdiction over a non-domiciliary who ‘in person or through an agent ... commits a tortious act within the state’ so long as the cause of action arises from that act.” Iqbal, 490 F.3d at 177 (quoting N.Y. C.P.L.R. 302(a)(2)).
Defendants Ashcroft, Thompson, and Mueller contend that Arar has failed to make a sufficient showing of their personal involvement in the tortious conduct he alleges. Accordingly, they urge that the claims brought against them be dismissed for lack of personal jurisdiction.
As we recently observed, personal jurisdiction cannot be predicated solely on a defendant’s supervisory title; “[rjather, a plaintiff must show that a defendant personally took part in the activities giving rise to the action at issue.” Iqbal, 490 F.3d at 177 (internal citation and quotation marks omitted). In Iqbal, we considered the related questions of whether the plaintiff had pleaded sufficient personal involvement of the defendants to (1) defeat a qualified immunity defense and (2) establish personal jurisdiction over the defendants. Id. We addressed first the question of what a plaintiff must allege to overcome a supervisor’s assertion of qualified immunity on a Rule 12(b)(6) motion to dismiss, holding that the allegations must suggest that the supervisory official:
(1) directly participated in the violation [of his constitutional rights], (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.
Id. at 152; see also id. at 157-58 (requiring a plaintiff who seeks to establish personal involvement by a defendant official “to amplify [his] claim with some factual allegations in those contexts where such *174 amplification is needed to render the claim plausible”).[11]
The complaint at issue in Iqbal set forth the “time frame and place” of the acts alleged to have violated the plaintiffs constitutional rights, id. at 166; alleged that these violations arose from “policies dealing with the confinement of those arrested on federal charges in the New York City area and designated ‘of high interest’ in the aftermath of 9/11,” id. at 175-76; and further alleged that various federal officials, including Ashcroft and Mueller, had “condoned” these policies, id. at 165.
We noted that the plaintiffs allegations, “although not entirely conclusory, suggest .that some of the [p]laintiffs claims are based not on facts supporting the claim but, rather, on generalized allegations of supervisory involvement.” Id. at 158. At the same time, we found it
plausible to believe that senior officials of the Department of Justice would be aware of policies concerning the detention of those arrested by federal officers in the New York City area in the aftermath of 9/11 and would know about, condone, or otherwise have personal involvement in the implementation of those policies.
Id. at 166. Taking into account the preliminary stage of that litigation and the Supreme Court’s recent clarification of the standard applicable to Rule 12(b)(6) motions to dismiss, see Bell Atlantic Corp. v. Twombly, — U.S. -, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), we concluded that the factual circumstances described in the plaintiffs complaint were sufficiently “plausible” to defeat the defendants’ assertion of qualified immunity for lack of personal involvement, id. at 166.
Turning to the related question of whether the district court had personal jurisdiction over the defendants, we concluded in Iqbal that if a plaintiff has pleaded personal involvement sufficient to defeat a qualified immunity defense, that would also “suffice[ ] to establish personal jurisdiction.” Iqbal, 490 F.3d at 177.
The plausibility standard applicable to a Rule 12(b)(6) motion to dismiss is, of course, distinct from the prima facie showing required to defeat a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. See Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194, 196-98 (2d Cir.1990). However, because our inquiries into the personal involvement necessary to pierce qualified immunity and establish personal jurisdiction are unavoidably “in-tertwin[ed],” Iqbal, 490 F.3d at 177, we now consider whether, in fight of the considerations set forth in Iqbal’s qualified immunity analysis, Arar has made a prima facie showing that personal jurisdiction exists.
As with the complaint in Iqbal, Arar’s complaint states the time frame and place of the acts alleged to have violated Arar’s rights; alleges that these violations arose from policies providing for the removal of non-U.S. citizens “suspected ... *175 of terrorist activity” to countries where they could be interrogated under torture, see Compl. ¶ 24; and further alleges that defendants “directed, ordered, confirmed, [or] acquiesced” in Arar’s removal to Syria and the mistreatment he suffered there, id. ¶ 71. We therefore conclude that, like the plaintiff in Iqbal, Arar has alleged sufficient facts about the role that Ashcroft, Thompson, and Mueller played in violating his rights to make a prima facie showing that personal jurisdiction over those defendants exists under New York’s long-arm statute. Accordingly, we proceed to consider the arguments that defendants have raised in support of their motions to dismiss, for failure to state a claim upon which relief can be granted, Arar’s various causes of action.
C. The Torture Victim Protection Act (Count One)
The TVPA, which is appended as a statutory note to the Alien Tort Claims Act, 28 U.S.C. § 1350, creates a cause of action for damages against “[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... subjects an individual to torture.” Id. § 1350 note (a)(1).[12] The District Court determined that the factual allegations set forth in Arar’s complaint did not state a claim that defendants acted “under color of foreign law.” United States Br. 54. We agree.
When seeking guidance on what it means to act under “color of foreign law” for the purposes of the TVPA, we generally look to “principles of agency law and to jurisprudence under 42 U.S.C. § 1983.” Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir.1995). As the Supreme Court has noted, “[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power ‘possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.’ ” West v. Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)); see also Hayut v. State Univ. of New York, 352 F.3d 733, 744 (2d Cir.2003). Applied to the present context, this proposition suggests that a defendant alleged to have violated the TVPA acts under color of foreign law when he “exercise[s] power ‘possessed by virtue of [foreign] law’ ” and commits wrongs “ ‘made possible only because the wrongdoer is clothed with the authority of [foreign] law.’ ” West, 487 U.S. at 49, 108 S.Ct. 2250.
Arar contends that our prior holdings contemplate a different standard of liability under § 1983 and, by extension, the TVPA. Specifically, he asserts that “Kletschka [v. Driver, 411 F.2d 436 (2d Cir.1969) (Lumbard, C.J.)] holds that the § 1983 test is satisfied if the state or its officials played a significant role in the result,” Plaintiffs Br. 25 (internal quotation marks omitted). We disagree. In Kletschka, we stated that, “[w]hen [a] vio *176 lation is the joint product of the exercise of a State power and of a non-State power[,] ... the test under the Fourteenth Amendment and § 1983 is whether the state or its officials played a ‘significant’ role in the result.” 411 F.2d at 449. We also noted, however, that, when the “non-State” actor is a federal official, we will not find that state law played a “significant role” unless the complained-of actions can be attributed to “the control or influence of the State defendants.” Id. As we explained, this “control or influence” test reflects the “evident purpose of § 1983[,] [which is] to provide a remedy when federal rights have been violated through the use or misuse of a power derived from a State.” Id. at 448-49 (emphasis added). Because federal officials cannot exercise power under foreign law without subjecting themselves to the control or influence of a foreign state, our comments in Kletschka are entirely consistent with the test for TVPA liability outlined above, which we hereby adopt in this opinion.
Arar alleges that defendants removed him to Syria with the knowledge or intention that Syrian authorities would interrogate him under torture. He also alleges that, while he was in Syria, defendants provided Syrian authorities with information about him, suggested subjects for Syrian authorities to interrogate him about, and received “all information coerced from [him] during [these] interrogations.” Compl. ¶ 56. Nowhere, however, does he contend that defendants possessed any power under Syrian law, that their allegedly culpable actions resulted from the exercise of power under Syrian law, or that they would have been unable to undertake these culpable actions had they not possessed such power. Because prior precedents of the Supreme Court and our Court indicate that such allegations are necessary to state a claim under the TVPA, we affirm the District Court’s dismissal of Count one of Arar’s complaint.[13]
D. Money damages under the Fifth Amendment (Counts Two, Three, and Four)
Counts two and three of Arar’s complaint allege that defendants violated Arar’s rights under the substantive due process component of the Fifth Amendment by removing him to Syria with the knowledge or intention that he would be detained and tortured there. Count four of Arar’s complaint alleges that defendants violated Arar’s rights to substantive and procedural due process under the Fifth Amendment by mistreating him while he was detained in the United States. Arar contends that both of these alleged violations are actionable pursuant to Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).
*177 On the theory that, “in appropriate eircumstances[,] a federal ... court may provide relief in damages for the violation of constitutional rights if there are ‘no special factors counseling hesitation in the absence of affirmative action by Congress,’ ” Davis v. Passman, 442 U.S. 228, 245, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (quoting Bivens, 403 U.S. at 396, 91 S.Ct. 1999), Bivens permitted plaintiffs to seek money damages for violations of the Fourth Amendment. Since then, however, the Supreme Court has created such remedies on only two other occasions: the first for employment discrimination in violation of the equal protection component of the Fifth Amendment’s Due Process Clause, Davis, 442 U.S. at 234, 99 S.Ct. 2264, and the second for violations of the Eighth Amendment by federal prison officials, Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). See Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 70, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (“In 30 years of Bivens jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against individual officers alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer’s unconstitutional conduct.”).
Indeed, the Supreme Court has “responded cautiously to suggestions that Bivens remedies be extended into new contexts.” Schweiker v. Chilicky, 487 U.S. 412, 421, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); see also Wilkie v. Robbins, — U.S. -, 127 S.Ct. 2588, 2597, 168 L.Ed.2d 389 (2007) (observing that, “in most instances,” the Court “ha[s] found a Bivens remedy unjustified”); Malesko, 534 U.S. at 70, 122 S.Ct. 515 (noting that, since Carlson, the Court has “consistently rejected invitations to extend Bivens ” to new contexts); FDIC v. Meyer, 510 U.S. 471, 484, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (discussing, with approval, the observations offered by the Court in Schweiker).
By asking us to devise a new Bivens damages action for alleged violations of the substantive due process component of the Fifth Amendment, Arar effectively invites us to disregard the clear instructions of the Supreme Court by extending Bivens not only to a new context, but to a new context requiring the courts to intrude deeply into the national security policies and foreign relations of the United States.
(1)
In its most recent consideration of Bivens, the Supreme Court set out the following framework for analyzing Bivens claims:
[O]n the assumption that a constitutionally recognized interest is adversely affected by the actions of federal employees, the decision whether to recognize a Bivens remedy may require two steps. [First], there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages. [Second, there is the principle that] a Bivens remedy is a subject of judgment: “the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation.”
Robbins, 127 S.Ct. at 2598 (quoting Bush v. Lucas, 462 U.S. 367, 378, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983)) (internal citation omitted).
*178 For guidance on what might constitute a “special factor,” we turn to the Supreme Court’s past considerations of Bivens. The Court’s prior precedents reveal a reluctance to create Bivens remedies where a coordinate branch of government is “in a far better position than a court,” Bush, 462 U.S. at 389, 103 S.Ct. 2404, to “decide whether ... a remedy should be provided,” id. at 380, 103 S.Ct. 2404; and, if a remedy is to be provided, to decide what form this remedy should take. For example, in Bush v. Lucas, the Court declined to create a damages remedy for alleged violations of a federal employee’s First Amendment rights upon determining that Congress was in a better position “to evaluate the impact” of damages suits “on the efficiency of the civil service.” Id. at 389, 103 S.Ct. 2404. Similarly, in Chappell v. Wallace, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), the Court declined to create a damages remedy for alleged violations of constitutional rights by military officers upon noting that the Constitution grants Congress “plenary control over ... regulations, procedures, and remedies related to military discipline,” id. at 301, 103 S.Ct. 2362; Congress, in exercising this authority, created a system of military justice that did not include a damages remedy for alleged violations of constitutional rights by military officers, id. at 304, 103 S.Ct. 2362; and, therefore, creation of such a remedy by the federal courts “would be plainly inconsistent with Congress’ authority in this field,” id.
In Schweiker v. Chilicky, the Court, relying on the reasoning set forth in Bush and Chappell, declined to create a non-statutory damages remedy against government officials alleged to have wrongfully terminated the plaintiffs’ Social Security benefits. As the Court explained, “making the inevitable compromises required in the design” of a welfare program is the responsibility of Congress rather than the courts, 487 U.S. at 429, 108 S.Ct. 2460; Congress had “discharged that responsibility,” id., by creating “elaborate administrative remedies,”- id. at 424, 108 S.Ct. 2460, for dissatisfied Social Security claimants; in view of the fact that these remedies did not include a provision for recovery of money damages, the Court, in keeping with its prior precedents, would not create a Bivens remedy, id. at 423, 91 S.Ct. 1999 (noting that “[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, [the Court has] not created additional Bivens remedies”). Schweiker, therefore, establishes that “the concept of special factors counseling hesitation in the absence of affirmative action by Congress has proved to include an appropriate judicial deference to indications that congressional inaction has not been inadvertent.” 487 U.S. at 423, 108 S.Ct. 2460 (internal quotation marks omitted).
(2)
To the best of our understanding, Arar seeks a Bivens remedy for at least two analytically distinct categories of claims. The first set of claims, described in Counts two and three of Arar’s complaint, arises from Arar’s allegation that defendants removed him to Syria with the knowledge or intention that he would be detained and tortured there. The second set of claims, described in Count four of the complaint, arises from Arar’s allegations about the way in which defendants treated him while he was detained in the United States.[14] *179 We consider each of these claims in turn.[15]
(a)
Arar’s removal-related claims arise from the alleged violation of his substantive due process interest in not being involuntarily removed to a country where he would be detained and subjected to torture. Step one of the Bivens inquiry reveals that Congress has created alternative processes for protecting this interest. The Foreign Affairs Reform and Restructuring Act of 1988, Pub. L. 105-277, codified at 8 U.S.C. § 1231 note (“FARRA”), states that the United States “shall ... not ... effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture,” id. § 1231 note (a); and provides for an alien to raise claims based on this section “as part of the review of a final order of removal pursuant to ... the Immigration and Nationality Act,” id. § 1231 note (d). Thus, as a general matter, Bivens relief would not be available for removal-related claims such as the one that Arar raises here because the INA’s “alternative, existing” mechanism of review would normally provide “a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages,” Robbins, 127 S.Ct. at 2598, under step one of our Bivens analysis.
Arar maintains, however, that because defendants intentionally prevented him from making use of the INA’s judicial review provisions, the allegations of his complaint compel a different conclusion. Assuming that Arar’s allegations are true, it would be perverse to allow defendants to escape liability by pointing to the existence of the very procedures that they allegedly obstructed and asserting that Arar’s sole *180 remedy lay there. Accordingly, we could regard this as a situation where the presence of an alternative remedial scheme does not “amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages,” Robbins, 127 S.Ct. at 2598.
Faced with similar allegations in Bishop v. Tice, 622 F.2d 349 (8th Cir.1980), the Court of Appeals for the Eighth Circuit held that federal officials who interfered with a plaintiffs access to an exclusive administrative remedial scheme could, pursuant to Bivens, be held liable for that interference inasmuch as it violated due process, but could not be sued for the underlying injury that the remedial scheme was designed to redress. In Bishop, the plaintiff, a federal employee, alleged, inter alia, wrongful termination, id. at 353, and charged defendants with obstructing his access to the relevant administrative remedies, id. at 353 n. 4. The Eighth Circuit observed that Congress had enacted “civil service discharge appeal procedures” in order to permit “a wrongfully dismissed employee to [obtain] reinstatement and back pay.” Id. at 356. The court noted, however, that “[t]he existence of civil service discharge appeal procedures is of little avail to [the plaintiff] ... if, as he has alleged, defendants blocked his resort to them.” Id. at 357. On this basis, the court determined that if the plaintiff “can prove [that] defendants interfered with his right to procedural due process [by obstructing access to the appeal process], he is entitled to the damages that actually resulted” pursuant to Bivens.
The Eighth Circuit did not conclude, however, that the interference of federal officials permitted the plaintiff to avoid the procedures for appeal set forth by Congress by litigating his underlying claims— wrongful termination and defamation— through a Bivens action in federal district court. Id. The court explained:
A Bivens style remedy for wrongfully dismissed federal employees not only is unnecessary but also would be at odds with the existing discharge appeal procedures to the extent that dismissed employees would be encouraged to bypass these procedures in order to seek direct judicial relief against either the government or individual government officers.
Id. Thus, the plaintiff in Bishop could maintain a Bivens cause of action against the officials for interfering with his due process rights (a claim equivalent to the claim brought by Arar in Count four of his complaint) but not for employment-related claims subject to the relevant procedures for appealing civil service discharges — in essence, claims of an analogous sort to the claims that Arar brings in Counts two and three of his complaint.
We find this reasoning compelling and, like the Eighth Circuit, are reluctant to permit litigants to avoid congressionally mandated remedial schemes on the basis of mere allegations of official interference. Accordingly, the review procedures set forth by the INA provide “a convincing reason,” Robbins, 127 S.Ct. at 2598, for us to resist recognizing a Bivens cause of action for Arar’s claims arising from his alleged detention and torture in Syria.[16] Even if they did not, however, our analysis of the significant “special factors,” id., implicated by these claims would lead us to *181 the same result at step two of our Bivens analysis.
Step two of our Bivens analysis requires us to determine whether Arar’s suit implicates what the Supreme Court has described as “special factors” that would counsel against creation of a Bivens remedy. “The special factors counseling hesitation in the creation of a new remedy ... d[o] not concern the merits of the particular remedy that [i]s sought. Rather, they relate! ] to the question of who should decide whether such a remedy should be provided ... [and] whether there are reasons for allowing Congress to prescribe the scope of relief that is made available.” Bush, 462 U.S. at 380, 103 S.Ct. 2404. Pursuant to the framework set forth by the Supreme Court, we are compelled to defer to the determination of Congress as to the availability of a damages remedy in circumstances where the adjudication of the claim at issue would necessarily intrude on the implementation of national security policies and interfere with our country’s relations with foreign powers.
The Supreme Court has observed on numerous occasions that determinations relating to national security fall within “an area of executive action in which courts have long been hesitant to intrude.” Lincoln v. Vigil, 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (internal quotation marks omitted); Department of Navy v. Egan, 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) (noting that, “unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs” and citing illustrative cases). At its core, this suit arises from the Executive Branch’s alleged determination that (a) Arar was affiliated with Al Qaeda, and therefore a threat to national security, and (b) his removal to Syria was appropriate in light of U.S. diplomatic and national security interests. There can be no doubt that for Arar’s claims to proceed, he must probe deeply into the inner workings of the national security apparatus of at least three foreign countries, as well as that of the United States, in order to determine the basis for his alleged designation as an A1 Qaeda affiliate and his removal to Syria via Jordan despite his request to be removed to Canada. Indeed, the Canadian government, which has provided Arar with compensation for its role in the events giving rise to this litigation, has asserted the need for Canada itself to maintain the confidentiality of material that goes to the heart of Arar’s claims. See 1 Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar, Factual Background 11-12 (2006) (“Canadian Commission, Factual Background”) (noting that the Canadian government required the Commission to review “[a] good deal of evidence ... in camera ” out of a need to protect Canadian “national security and international relations interests”). For its part, the United States, as noted above, has invoked the state-secrets privilege in response to Arar’s allegations.
Assuming that a sufficient record can even be developed in light of the confidential nature of the relevant evidence and the involvement of at least three foreign governments — Syria, Jordan, and Canada — in the salient events alleged in the complaint, the District Court would then be called upon to rule on whether Arar’s removal was proper in light of the record. In so doing, the effective functioning of U.S. foreign policy would be affected, if not undermined. For, to the extent that the fair and impartial adjudication of Arar’s suit requires the federal courts to consider and evaluate the implementation of the foreign and national security policies of the United *182 States and at least three foreign powers, the ability of the federal government to speak with one voice to its overseas counterparts is diminished, and the coherence and vitality of U.S. foreign policy is called into question.
On this point, the observations of the Court of Appeals for the District of Columbia Circuit are particularly relevant:
[T]he special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad. The foreign affairs implications of suits such as this cannot be ignored — their ability to produce what the Supreme Court has called in another context “embarrassment of our government abroad” through “multifarious pronouncements by various departments on one question.” Whether or not the present litigation is motivated by considerations of geopolitics rather than personal harm, we think that as a general matter the danger of foreign citizens’ using the courts in situations such as this to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist.
Sanchez-Espinoza v. Reagan, 770 F.2d 202, 209 (D.C.Cir.1985) (Scalia, J.) (quoting Baker v. Carr, 369 U.S. 186, 226, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Similarly, we need not determine whether the motivation behind this lawsuit arises from geopolitical or personal considerations in order to recognize that litigation of this sort threatens to disrupt the implementation of our country’s foreign and national security policies. The litigation of Arar’s claims would necessarily require an exploration of the intelligence relied upon by the officials charged with implementing our foreign and national security policies, the confidential communications between the United States and foreign powers, and other classified or confidential aspects of those policies, including, perhaps, whether or not such policies even exist.[17] There can be no doubt that litigation of this sort would interfere with the management of our country’s relations with foreign powers and affect our government’s ability to ensure national security.
In addition, the Supreme Court has observed that, when considering “the practical consequences of making [a] cause [of action] available to litigants in the federal courts,” Sosa v. Alvarez-Machain, 542 U.S. 692, 732-33, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), “there is a strong argument that federal courts should give serious weight to the Executive Branch’s view of the case’s impact on foreign policy,” id. at 733 n. 21, 124 S.Ct. 2739. Here, the United States has asserted the state-secrets privilege over information at the *183 core of the claims being raised and, in support of that assertion of privilege, both the Acting Attorney General and Secretary of the Department of Homeland Security have submitted sworn statements that Arar’s removal-related claims cannot be adjudicated without harming the diplomatic and national security interests of the United States.
For the reasons stated above, we are not required, at this juncture in the proceedings, to consider the possible consequences of the assertion of the state-secrets privilege by the United States. The assertion of the state-secrets privilege is, however, a matter of record, and a reminder of the undisputed fact that the claims under consideration involve significant national security decisions made in consultation with several foreign powers. Cf. ante at 181 (noting the Canadian government’s efforts to protect evidence relevant to Canadian “national security and international relations interests”); Canadian Commission, Analysis and Recommendations, ante, at 11 (stating that the governments of the United States, Jordan, and Syria all declined to “give evidence or otherwise participate” in the hearings held by the Commission). In that sense, the government’s assertion of the state-secrets privilege in this litigation constitutes a further special factor counseling us to hesitate before creating a new cause of action or recognizing one in a domain so clearly inhospitable to the fact-finding procedures and methods of adjudication employed by the federal courts.[18]
That this action involves the intersection of removal decisions and national security also weighs against creation of a Bivens remedy. The Supreme Court has recently noted that “[r]emoval decisions, including the selection of a removed alien’s destination, may implicate our relations with foreign powers,” Jama v. Immigration and Customs Enforcement, 543 U.S. 335, 348, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) (internal quotation marks omitted) (quoting Mathews v. Diaz, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)); and it is well established that “[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative — the political — Departments of the Government,” First Nat. City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 766, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972) (quoting Oetjen v. Central *184 Leather Co., 246 U.S. 297, 302, 38 S.Ct. 309, 62 L.Ed. 726 (1918) (internal quotation marks omitted)).[19] In that sense, Arar’s removal-related claims raise a difficulty similar to that posed by the plaintiffs in Chappell. Here, as there, the claim under consideration raises questions entrusted principally to other branches of government; one of these other branches — namely, Congress — has exercised its authority to provide “what it considers adequate remedial mechanisms for constitutional violations,” Schweiker, 487 U.S. at 423, 108 S.Ct. 2460; and the remedial scheme in question — appellate review of removal decisions — does not provide for recovery of money damages. In light of these indications that absence of a Con-gressionally-mandated damages remedy “has not been inadvertent,” Schweiker, 487 U.S. at 423, 108 S.Ct. 2460, we understand the judicial creation of a damages remedy to be “plainly inconsistent,” Chappell, 462 U.S. at 304, 103 S.Ct. 2362, with Congress’s exercise of authority over removal-related claims.
In sum, we hold that — barring further guidance from the Supreme Court — a Bivens remedy is unavailable for claims “arising from any action taken or proceeding brought to remove an alien from the United States under” the authority conferred upon the Attorney General and his delegates by the INA. 8 U.S.C. § 1252(b)(9).
(b)
The vitality of Arar’s request for Bivens relief for claims arising from Count four of his complaint (“domestic detention”) turns, not on the existence of any “special factors,” but on the more commonplace fact that Arar’s factual allegations fail to state a claim under the Due Process Clause of the Fifth Amendment. Arar apparently seeks to bring two distinct types of claims based on events alleged to have occurred in the United States. The first is a “due process” claim based on defendants’ alleged obstruction of Arar’s access to counsel and to the courts.[20] The second is a substantive due process challenge to the conditions of Arar’s U.S. detention. We consider each of these in turn.
(i)
The complaint alleges that, while Arar was incarcerated at the MDC, defendants ignored his initial requests to see a lawyer, misled him about the availability of his lawyer so that they could question him outside her presence, and misled his lawyer about his whereabouts so that they could prevent her from challenging his removal to Syria. Compl. ¶¶ 37, 44, 46. These allegations, if taken as true, may be *185 sufficient to establish that one or more federal officials intentionally obstructed Arar’s access to counsel and to the courts. They are not, however, sufficient to establish the appropriateness of Bivens relief. Rather, for a Bivens remedy to be available, Arar must establish that (1) an individual in his position possessed a constitutional right of access to counsel and the courts, and (2) that defendants’ actions violated this constitutional right. See, e.g., Robbins, 127 S.Ct. at 2598 (noting that violation of a “constitutionally recognized interest” is a necessary element of a Bivens claim).

a. Right to Counsel

Arar contends that our prior precedents — specifically, Montilla v. INS, 926 F.2d 162 (2d Cir.1991) and Waldron v. INS, 17 F.3d 511 (2d Cir.1993) — establish that, although he was an unadmitted alien, he possessed a constitutional right to counsel under the Due Process Clause of the Fifth Amendment. He also contends that he possessed a due process right to counsel derived from the rights accorded to him under 8 C.F.R. § 235.8(a)[21] and 8 U.S.C. §§ 1362,[22] 1225(c)(3),[23] and 1225(b)(l)(B)(iv).[24] We conclude that certain of the authorities upon which Arar relies — namely, Montilla, Waldron, and 8 U.S.C. §§ 1362 and 1225(b)(l)(B)(iv) — are simply inapplicable to an individual in Arar’s position. We further conclude that, even if an unadmitted alien does enjoy a derivative due process right to the assistance of counsel under 8 U.S.C. § 1225(c)(3) and 8 C.F.R. § 235.8(a), that right was neither triggered nor violated by the factual allegations stated in Arar’s complaint.
Section 1362 applies only to “removal proceedings before an immigration judge and ... appeal proceedings before the Attorney General.” Similarly, Montilla and Waldron, recognize the existence of a due process right to counsel in a subset of the *186 circumstances to which section 1362 applies — that is, removal of an alien through deportation. See Waldron, 17 F.3d at 517; Montilla, 926 F.2d at 166.
As an unadmitted alien, Arar as a matter of law lacked a physical presence in the United States.[25] See Kaplan v. Tod, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925) (noting that an alien “stopped at the boundary line” of the United States “had gained no foothold” in the country). His entitlement to a removal procedure of the sort that would trigger the provisions of section 1362 was therefore limited to what Congress and the INS saw fit to provide.[26] *187 See, e.g., Zadvydas v. Davis, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (observing that the full protections of the Due Process Clause apply only to “ ‘persons’ within the United States”); Landon v. Plasencia, 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) (noting that “an alien seeking initial admission to the United States ... has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative”); U.S. ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (holding that “[wjhatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned”).
In this case, the applicable statutory provisions specifically authorized the Attorney General to remove Arar “without further inquiry or hearing by an immigration judge” if the Attorney General, after reviewing the evidence establishing his inadmissibility, determined that a hearing “would be prejudicial to the public interest, safety, or security.”[27] See 8 U.S.C. § 1225(c)(2)(B). Arar does not claim that the Attorney General failed to properly review the evidence of his inadmissibility. Nor does he contend that the procedures set forth in section 1225(c) were constitu-tionally inadequate. Cf. Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (holding that the due process rights of an unadmit-ted alien barred from entry on security grounds were not violated when he was excluded from the United States without a hearing). Accordingly, Arar fails to establish that he possessed any entitlement to a pre-removal hearing. And because he possessed no entitlement to a hearing, he falls beyond the scope of section 1362 and — by extension — our holdings in Montilla and Waldron. Cf. Plasencia, 459 U.S. at 25, 103 S.Ct. 321 (noting that a “deportation hearing is the usual means of proceeding against an alien already physically in the United States, ... [and] [an] exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission,” and that “the alien who loses his right to reside in the United States in a deportation hearing has a number of substantive rights not available to the alien who is denied admission in an exclusion proceeding”). Arar also falls beyond the scope of the right to counsel set forth in section 1225(b)(l)(B)(iv); this provision is limited to applicants for asylum and Arar neither made, nor makes, a claim to asylum in the United States.
*188 Section 1225(c)(3) and 8 C.F.R. § 235.8(a) both contemplate that an unad-mitted alien being excluded on security-grounds will have the opportunity to submit “a written statement and additional information for consideration by the Attorney General.” Assuming for the sake of argument that an unadmitted alien who cannot provide a written statement without the assistance of counsel may enjoy a due process entitlement to counsel, we conclude that Arar has not alleged any facts that would trigger such a right. For example, Arar’s complaint nowhere alleges that he wished to submit a written statement but was prevented from doing so by the restrictions that defendants allegedly imposed on his access to counsel. Nor does it allege any background circumstances from which we may draw such an inference.[28]
In sum, Arar is unable to point to any legal authority suggesting that, as an unadmitted alien who was excluded pursuant to the procedures set forth in 8 U.S.C. § 1225(c), he possessed any form of entitlement to the assistance of counsel — let alone a constitutional entitlement, the violation of which could constitute a predicate for the Bivens relief he seeks. Accordingly, we conclude that Arar’s allegations about the various ways in which defendants obstructed his access to counsel fail to state a claim -under the Due Process Clause of the Fifth Amendment.

b. Right of Access to the Courts

As the Supreme Court has noted, the ultimate purpose of an access to the courts claim is to obtain “effective vindication for a separate and distinct right to seek judicial relief for some wrong.” Christopher v. Harbury, 536 U.S. 403, 414-15, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002). For this reason, the complaint setting forth the claim in question must include an adequate description of a “ ‘nonfrivolous,’ ‘arguable’ underlying claim” that the plaintiff has lost as a result of the complained-of official actions. Id. at 415, 122 S.Ct. 2179.
Arar’s complaint fails this test insofar as his complaint fails to set forth adequately “the underlying cause of action,” id. at 418, 122 S.Ct. 2179, that defendants’ conduct compromised. Compare id. at 418, 122 S.Ct. 2179 (finding excessively vague the plaintiffs claim that the defendants’ “false and deceptive information and concealment foreclosed [the plaintiff] from effectively seeking adequate legal redress”) with Compl. ¶ 93 (alleging that, by subjecting Arar to “measures ... that interfered with his access to lawyers and the courts, Defendants ... violated Plaintiffs right ... to petition the courts for redress of his grievances”). Although Arar now claims that defendants compromised his right to seek a court order “enjoin[ing] his removal to a country that would torture him, as a violation of FARRA and [the Convention Against Torture (‘CAT’) ],” Plaintiffs Reply Br. 34, his complaint makes no mention of FARRA, the CAT, or the possibility of injunctive relief. Cf. Harbury, 536 U.S. at 416, 122 S.Ct. 2179 (“Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations in the complaint sufficient to give fair notice to a defendant.”). Indeed, Arar’s complaint alleges that “[d]efendants ... violated [p]laintiff s right ... to petition the courts for redress of his grievances” without any further elaboration *189 whatsoever. Compl. ¶ 93. This concluso-ry allegation falls far short of the pleading standard set forth in Harbury. See Harbury, 536 U.S. at 418, 122 S.Ct. 2179 (“[T]he complaint failed to identify the underlying cause of action that the alleged deception had compromised, going no further than the protean allegation that the State Department and NSC defendants’ ‘false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress.’”). Accordingly, we conclude that Arar has failed to state a due process claim based on defendants’ alleged obstruction of his access to the courts.
(ii)
The framework for evaluating a eondi-tions-of-confinement challenge brought by an unadmitted alien constitutes a question of first impression for our Court. Cf. Lynch v. Cannatella, 810 F.2d 1363, 1373 (5th Cir.1987) (noting that “[t]he ‘entry fiction’ that excludable aliens are to be treated as if detained at the border despite their physical presence in the United States .... does not limit the right of excludable aliens detained within United States territory to humane treatment”). Defendants urge us to adopt the position taken by the Fifth Circuit and Eleventh Circuit, both of which look to whether the challenged actions amounted to “gross physical abuse.” Lynch, 810 F.2d at 1374; see also Correa v. Thornburgh, 901 F.2d 1166, 1171 n. 5 (2d Cir.1990) (noting, in passing, the holding of Lynch); Adras v. Nelson, 917 F.2d 1552, 1559 (11th Cir.1990) (adopting and applying the approach set forth by the Fifth Circuit in Lynch). Arar, in turn, urges us to apply the approach that we have traditionally taken when evaluating substantive due process challenges to conditions of pre-trial confinement. This approach looks to whether the challenged conditions amount to “punishment that may not constitutionally be inflicted upon [pre-trial] detainees qua detainees.” Bell v. Wolfish, 441 U.S. 520, 539, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); see also Block v. Rutherford, 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (applying this approach); Iqbal, 490 F.3d at 168-69 (same).
Arar alleges that, while in the United States, he was subjected to “coercive and involuntary custodial interrogations .... conducted for excessively long periods of time and at odd hours of the day and night” on three occasions over twelve days; deprived of sleep and food on his first day of detention; and, thereafter, was “held in solitary confinement, chained and shackled, [and] subjected to [an] invasive strip-search[ ].” Compl. ¶ 4. These allegations, while describing what might perhaps constitute relatively harsh conditions of detention, do not amount to a claim of gross physical abuse. Cf. Adras, 917 F.2d at 1559 (finding that detainees had not sufficiently alleged “gross physical abuse” where their complaint claimed, inter alia, “insufficient nourishment,” “prolonged incarceration under harsh conditions,” “deprivation of liberty, embarrassment, humiliation, disgrace and injury to feelings, physical and mental pain and suffering”). For this reason, we conclude that Arar has not adequately alleged that the conditions of his confinement violated his Fifth Amendment substantive due process rights under the “gross physical abuse” approach of the Fifth Circuit and Eleventh Circuit.
Arar fares no better under the alternative standard he proposes.[29] As the *190 Supreme Court noted in Wolfish, “the fact that [lawful] detention interferes with the detainee’s understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into ‘punishment.’ ” 441 U.S. at 537, 99 S.Ct. 1861. Only if a detention facility official has “expressed intent to punish,” id. at 538, 99 S.Ct. 1861 or “a restriction or condition is not reasonably related to a legitimate goal” may a court “infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees,” id. at 539, 99 S.Ct. 1861. Arar nowhere alleges that the conditions of his confinement were inflicted with punitive intent or were otherwise unrelated to a legitimate government purpose. Rather, his complaint repeatedly emphasizes that defendants kept him in custody in order to interrogate him, and sought to interrogate him in an effort to obtain information “about his membership in or affiliation with various terrorist groups.” Compl. ¶ 31. Nor do the other incidental conditions of his detention — specifically, the shackling, strip search, and delay in providing him with adequate food and sleeping facilities — rise to the level of a constitutional violation. Cf. Wolfish, 441 U.S. at 530, 543, 558, 99 S.Ct. 1861 (rejecting the claim that, in subjecting pre-trial detainees to visual body cavity searches and using common rooms to provide temporary sleeping accommodations, the officials running a federal detention facility had violated the detainees’ rights of substantive due process). For this reason, we conclude that Arar’s allegations also fail to state a claim under the punishment-focused approach we have traditionally applied when analyzing substantive due process challenges to conditions of pre-trial confinement.
Because it is not implicated by the facts of this case, we leave for another day the question of whether an unadmitted alien challenging his conditions of confinement has rights beyond the right to be free of “gross physical abuse at the hands of state [and] federal officials,” Lynch, 810 F.2d at 1374.
(iii)
Having determined that the allegations set forth in Count four of Arar’s complaint do not state a claim under the Due Process Clause of the Fifth Amendment, we affirm the order dismissing Count four of Arar’s complaint. Contrary to Judge Sack’s suggestion, we do not hold that a Bivens action is unavailable for the claims raised in Count four of Arar’s complaint. See Dissent 201-02. Rather, we decline to reach this question in light of Arar’s failure to allege facts that, if taken as true, establish the violation of any “constitutionally protected interest.” Robbins, 127 S.Ct. at 2598.
E. Declaratory relief (General Prayer for Relief)
Arar’s prayer for relief includes a request that this Court enter a judgment declaring that the actions defendants took with respect to him “are illegal and violate [his] constitutional, civil, and international *191 human rights.” Compl. 24. Following the Supreme Court’s instructions, we begin our analysis by considering “whether this action for a declaratory judgment is the sort of Article III case or controversy to which federal courts are limited.” Calderon v. Ashmus, 523 U.S. 740, 745, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) (internal quotation marks omitted).
As the Supreme Court has frequently noted, “the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III,” Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); and “the irreducible constitutional minimum of standing contains three elements,” id.:
First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, [affecting the plaintiff in a personal and individual way] and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—-the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
Id. at 560-61, 112 S.Ct. 2130 (citations and internal quotation marks omitted, first alteration supplied); see also Baur v. Veneman, 352 F.3d 625, 631-32 (2d Cir.2003). “The party invoking federal jurisdiction bears the burden of establishing these elements.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130.
The conduct of which Arar complains is his alleged detention, by defendants, “for the purpose of removing him to Syria for arbitrary detention and interrogation under torture.” Pi’s Br. 55. The personal injury he alleges is a “bar to reentering the United States,” which harms him “because he has worked for sustained periods for U.S. companies in the past, and ... would like to return to the-U.S. for that purpose, as well as to visit relatives and friends.” Pl.’s Br. 54.
In examining Arar’s claim, we conclude that he fails to meet both the “traceability” and “redressability” prongs of the test for constitutional standing set forth by the Supreme Court. The reentry bar from which Arar seeks relief arises as an automatic incident of (1) the finding that Arar was inadmissible to the United States for reasons of national security, see 8 U.S.C. § 1182(a)(3)(B); and (2) the entry of an order of removal pursuant to that finding, see 8 U.S.C. § 1225(c). It bears no relationship with the country of removal that defendants selected for Arar. Any injury associated with the re-entry bar is, therefore, not “fairly traceable” to the conduct of which Arar complains—namely, defendants’ removal of Arar “to Syria for arbitrary detention and interrogation under torture.” Pi’s Br. 55 (emphasis added).
The problem with redressability arises because, as Arar’s submissions to both this Court and the District Court unequivocally establish, Arar does not directly challenge his removal order or defendants’ underlying decision to classify him as inadmissible to the United States. See 414 F.Supp.2d at 259 (discussing Arar’s brief in opposition to defendants’ motion to dismiss). Arar contends that “if [he] prevails on his constitutional claims, the removal order will be expunged as null and void, thereby lifting the current barrier to [his] re-entry into the U.S.” Pi’s Br. 53. He does not, however, articulate the theory on which he bases this argument or, for that matter, *192 set forth any authority in support of his position. We conclude that Arar’s claimed injury—namely, the bar to his re-entry to the United States pursuant to a removal order, the lawfulness of which he does not challenge—is not likely to be redressed (indeed, cannot be redressed) by the declaratory judgment he seeks. That is so because a declaration that defendants acted illegally by removing Arar to a particular country for a particular purpose would not change the underlying, uncontested fact that Arar cannot be admitted to the United States: Even if Arar had been removed to Canada rather than Syria, he would still be inadmissible to the United States by virtue of the order of removal entered against him.
Because Arar cannot meet the test for constitutional standing set forth by the Supreme Court, we lack subject matter jurisdiction over his request for a judgment declaring that defendants violated his rights by removing him to Syria for the purpose of arbitrary detention and interrogation under torture.
CONCLUSION
To summarize:
(1) Because we conclude that reasons independent of the state-secrets privilege require dismissal of Arar’s complaint, we do not consider whether, if Arar were able to state a claim for relief under notice pleading rules, the assertion of the state-secrets privilege by the United States would require dismissal of Counts one through three of his complaint.
(2) Because we conclude that Arar’s complaint has not stated a claim upon which relief can be granted, we need not consider defendants’ argument that if any of Arar’s claims were cognizable defendants would be entitled to qualified immunity with respect to those claims.
(3) Arar has satisfied Article III requirements as to the claims raised in Counts two and three of his complaint. However, the adjudication of whether, under the facts of this case, the INA stripped the District Court of subject matter jurisdiction to hear Arar’s removal-related constitutional claims would be particularly difficult in light of the record before us. Accordingly, we exercise our discretion to dismiss Counts two and three on other threshold—that is, non-merits—grounds, as set forth below.
(4) For the reasons stated above, we conclude that Arar has made a prima facie showing sufficient to establish personal jurisdiction over Thompson, Ashcroft, and Mueller at this early stage of the litigation.
As to the causes of action set forth in Arar’s complaint, we conclude that:
(5) Count one of Arar’s complaint must be dismissed because Arar’s allegations about the events surrounding his removal to Syria do not state a claim against defendants under the Torture Victim Protection Act;
(6) Counts two and three of Arar’s complaint, which envisage the judicial creation of a cause of action pursuant to the doctrine of Bivens, must also be dismissed because (a) the remedial scheme established by Congress is sufficient to convince us at step one of our Bivens analysis to refrain from creating a free standing damages remedy for Arar’s removal-related claims. Even giving Arar the benefit of the doubt and assuming that this remedial scheme were insufficient to convince us, (b) “special factors” of the kind identified by the Supreme Court in its Bivens jurisprudence counsel against the judicial creation of a damages remedy for claims arising from Arar’s removal to Syria;
(7) Count four of Arar’s complaint must be dismissed because Arar’s allegations *193 about the mistreatment he suffered while in the United States do not state a claim against defendants under the Due Process Clause of the Fifth Amendment; and
(8) With respect to Arar’s petition for a declaratory judgment, Arar has not adequately established federal subject matter jurisdiction over his request for a judgment declaring that defendants acted illegally by removing him to Syria so that Syrian authorities could interrogate him under torture.
The judgment of the District Court is AFFIRMED.

. We do not adopt or otherwise endorse the findings of the Commission. Our reference to the existence of these findings is consistent with our order of October 23, 2007, in which we granted Arar's motion to take judicial notice of the existence of the report and scope of its contents but declined to take judicial notice of the findings set forth therein.

. Arar sues Thompson, Ziglar, Blackman, McElroy and the Doe defendants in their individual capacities. He sues Ashcroft and Mueller in both their individual and official capacities His complaint names the Secretary of Homeland Security and the Regional Director of Immigration and Customs Enforcement in their official capacities only.

. Judge Sack characterizes "[l]he fact that Arar did not choose to verify his complaint ... [as] irrelevant.” Dissent 193 n. 3. As set forth below, this fact determines whether the complaint itself may serve as evidence in support of the allegations made therein — an issue that, in turn, bears on whether the INA’s jurisdiction — stripping provisions deprived the District Court of subject matter jurisdiction over Arar's removal-related claims. See infra 169-72.

. In Zuckerbraun v. General Dynamics Corp., 935 F.2d 544 (2d Cir.1991), we observed that, "[o]nce properly invoked, the effect of the [state-secrets] privilege is to exclude [privileged] evidence from the case.” Id. at 546. Thus, although a plaintiff's complaint may "state a claim for relief under notice pleading rules,” the plaintiff may not be able to obtain "access to evidence necessary ... to state a prima facie claim.” Id. at 547. Under such circumstances, "dismissal is probably most appropriate under Rule 56 on the ground that plaintiff, who bears the burden of proof, lacks sufficient evidence to carry that burden.” Id.

. Accordingly, Judge Sack is plainly incorrect to assert that the allegations set forth in Arar's complaint "must be treated as established facts for present purposes.” Dissent 203.

. Defendants do not challenge the District Court's subject matter jurisdiction over Counts two and three on Article III grounds. We agree that the requirements of Article III have been met with regard to these counts.

. Section 1231 provides, in relevant part, that “[t]he Attorney General may disregard” an alien's designation of the country to which he wishes to be removed if, among other things, “the government of the country is not willing to accept the alien into the country,” id. § 1231(b)(2)(C)(iii) or "the Attorney General decides that removing the alien to the country is prejudicial to the United States,” id. § 1231(b)(2)(C)(iv).

. Section 1252(a)(2)(B)(ii) states, in relevant part, that “no court shall have jurisdiction to review ... any ... decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified ... to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of [asylum].”

. See Ashcroft Br. 22 ("[Under] the basic judicial review scheme of the INA[,] ... claims arising out of agency actions do not belong in district court.”); Thompson Br. 16-17; Mueller Br. 1 n. 1 (joining in co-defendants’ arguments); Blackman Br. 27 (same); McElroy Br. 25 (same); Ziglar Br. 21 (same).

. The partial dissent concludes that "[b]e-cause Arar is not challenging his removal order,” the jurisdiction-stripping provisions of the INA “do[] not apply.” Dissent 212 n. 31. We disagree. As the dissent itself acknowledges, although Arar does not directly challenge his order of removal, the circumstances of his removal serve as a factual predicate for the claims set forth in counts two and three of Arar's complaint. Id. at 204 (expressing the view that "[t]he assessment of Arar’s alleged complaint must take into account the entire arc of factual allegations that Arar makes — his interception and arrest; his questioning, principally by FBI agents, about his putative ties to terrorists; his detention and mistreatment at JFK Airport in Queens and the MDC in Brooklyn; the deliberate misleading of both his lawyer and the Canadian Consulate; and his transport to Washington, D.C., and forced transfer to Syrian authorities for further detention and questioning under torture”). The INA clearly provides that “[jludicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any ac *172 tion taken or proceeding brought to remove an alien from the United States under this sub-chapter shall be available only in judicial review of a final order under this section.” 8 U.S.C. § 1252(b)(9) (emphasis added). In light of these clear instructions from Congress, the District Court's jurisdiction to hear this matter cannot be resolved as easily as the dissent might wish. Cf. Ruhrgas AG, 526 U.S. at 583, 119 S.Ct. 1563 ("For a court to pronounce upon the merits when it has no jurisdiction to do so ... is for a court to act ultra vires.”) (ellipsis added, internal quotation marks and modifications omitted).

. The Supreme Court has recently granted certiorari in Iqbal for the purpose of considering (1) the appropriate pleading standard when a plaintiff seeks to state an individual-capacity claim, pursuant to Bivens, against "a cabinet-level officer or other high-ranking official” and (2) "[w]hether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials.” Petition for a Writ of Certiorari, Ashcroft v. Iqbal, 2008 WL 336225 (U.S. Feb. 6, 2008), cert. granted, 128 U.S. 2931, - S.Ct. -, - L.Ed.2d -, 76 U.S.L.W. 3417, 2008 WL 336310 (U.S. June 16, 2008) (No. 07-1015).

. Several Courts of Appeals have held that neither the TVPA nor the Alien Tort Claims Act establishes the United States’s consent to be sued under the cause of action created by the TVPA. See 28 U.S.C. § 1350; see also Goldstar (Panama) S.A. v. United States, 967 F.2d 965, 968 (4th Cir.1992) (''[A]ny party asserting jurisdiction under the Alien Tort Statute must establish, independent of that statute, that the United States has consented to suit”); Koohi v. United States, 976 F.2d 1328, 1332 n. 4 (9th Cir.1992) (noting that the Alien Tort Claims does not constitute a waiver of sovereign immunity); Sanchez-Espinoza v. Reagan, 770 F.2d 202, 207 (D.C.Cir.1985) (same). We agree with our sister circuits. Accordingly, we conclude that any cause of action Arar has under the TVPA exists against the defendants being sued in their individual capacities alone.

. The District Court also determined that Arar, "as a non-citizen[,] is unable to demonstrate that he has a viable cause of action," 414 F.Supp.2d. at 287, on the understanding that "only U.S. citizens ... are covered by the TVPA,” id. at 263. Because we affirm on other grounds, we need not engage in extensive analysis of this issue. We do, however, observe that past holdings of our Court, as well as those of our sister courts of appeals, strongly suggest that TVPA actions may in fact be brought by non-U.S. citizens. See, e.g., Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 104-05 (2d Cir.2000) (expressing the view that the remedies provided by the TVPA "extend[] ... to aliens”); Kadic, 70 F.3d at 236 (reversing a district court judgment that dismissed, for failure to state a claim, a suit brought by "Croat and Muslim citizens of ... Bosnia-Herzegovina” seeking relief under the TVPA); see also Arce v. Garcia, 434 F.3d 1254, 1257-58 (11th Cir.2006) (allowing TVPA claim by citizens of El Salvador); Hilao v. Estate of Marcos, 103 F.3d 767, 771 (9th Cir.1996) (allowing TVPA claim by citizens of the Philippines).

. It is not clear whether Arar's complaint seeks to raise a third potential set of claims, arising from the general allegations that defendants provided Syrian authorities with in *179 formation about him and suggested subjects for them to pursue in their interrogation of him. See Compl. ¶¶ 55-56. We need not explore this issue, however, as Arar has not raised such a claim in his written and oral presentations to this Court. See, e.g., Pi’s Br. 37 (describing the Fifth Amendment claims arising from Arar's removal to Syria as resting on the factual allegations that “defendants (i) acted against [Arar] while he was in Federal custody within the United States and; (ii) transported him abroad precisely to evade constitutional protections”); see also id. at 3 (describing the Fifth Amendment claims arising from Arar's removal to Syria as resting on the factual allegation that defendants "transported] Arar to Syria” so that Syrian authorities could detain and coercively interrogate him).

. Rather than address these legal claims as pleaded by Arar, Judge Sack consolidates all of Arar's allegations into an omnibus generalized grievance, unmoored from any recognized legal claim. Judge Sack would take together events occurring within the United States and those occurring overseas; allegations of misconduct attributed to U.S. officials and to foreign agents; and violations that allegedly occurred during the period of time that Arar was held in U.S. custody as well as the time Arar spent in foreign custody. See Dissent 203-04. Judge Sack offers no authority to justify his remarkable treatment of Arar's complaint. It is clear, however, that his approach runs contrary to the Supreme Court's longstanding observations about the constitutional significance of geographic borders. Cf. Zadvydas v. Davis, 533 U.S. 678, 690, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders.”); United States v. Verdugo-Urquidez, 494 U.S. 259, 269, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (noting that the Supreme Court's "rejection of extraterritorial application of the Fifth Amendment [has been] emphatic”); Johnson v. Eisentrager, 339 U.S. 763, 771, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (noting that "in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien’s presence within its territorial jurisdiction that gave the Judiciary power to act”).

. We agree with Judge Sack that the alleged circumstances of Arar's removal may have made it difficult for Arar himself to seek relief through the procedures set forth in the INA. We note, however, that Arar did have an attorney working on his behalf; and that his attorney was in a position to inquire about both Arar's whereabouts and the status of the proceedings that the INS had initiated against him.

. That adjudication of Arar's claims would require inquiry into national-security intelligence and diplomatic communications cannot be doubted in light of federal regulations providing that, in determining whether removal to a particular country would be consistent with the obligations imposed by FARRA,
(1) The Secretary of State may forward to the Attorney General assurances that the Secretary has obtained from the government of a specific country that an alien would not be tortured there if the alien were removed to that country.
(2) If the Secretary of State forwards assurances described in paragraph (c)(1) of this section to the Attorney General for consideration by the Attorney General or her delegates under this paragraph, the Attorney General shall determine, in consultation with the Secretary of State, whether the assurances are sufficiently reliable to allow the alien's removal to that country consistent with Article 3 of the Convention Against Torture....
8 C.F.R. § 208.18(c).

. Our colleague, in his partial dissent, criticizes the majority for taking the state-secrets doctrine into account in the course of its Bivens analysis. See Dissent 212-13. He would rather this suit go forward on the understanding that ''[a]ny legitimate interest that the United States has in shielding national security policy and foreign policy from intrusion by federal courts ... would be protected by the proper invocation of the state-secrets privilege." Id. Once put into effect, however, the state-secrets doctrine would have the undoubted effect of excluding information of central relevance to the claims brought in this complaint. See ante 166-67 (describing the information over which the United States has asserted the state-secrets privilege). The likely result would be foreclosure of our ability to resolve the important legal issues of first impression raised by this case. See id.; see also El-Masri v. United States, 479 F.3d 296, 300, 313 (4th Cir.2007) (dismissing plaintiff’s complaint on the basis of the invocation of the state-secrets doctrine by the United States without considering whether, as a matter of law, plaintiff could state a claim under Bivens or the Alien Tort Claims Act based on his allegations that he was detained and interrogated "pursuant to an unlawful policy and practice ... known as 'extraordinary rendition': the clandestine abduction and detention outside the United States of persons suspected of involvement in terrorist activities, and their subsequent interrogation using methods impermissible under U.S. and international laws”). In light of the parties' requests for guidance on the important questions of first impression presented by this suit, see ante 167-68 we are reluctant to take the path our colleague suggests.

. Judge Sack agrees that adjudication of Arar’s claims requires us to intrude deeply into the national security policies and foreign relations of the United States, see Dissent 212-13, but, nevertheless, would hold that Arar's suit presents no " 'special factors’ counselling] against the application of Bivens,” id. at 212.

. Although Arar describes his second claim as arising under the substantive due process component of the Fifth Amendment, see, e.g., Compl. 23, Plaintiff’s Reply Br. 21, the theory of liability he proffers is more suggestive of a procedural due process claim. See, e.g., Plaintiff’s Reply Br. 29 (asserting that "Arar had a right to the assistance of his attorney before being deemed inadmissible, [and] before being removed to a country where he would be tortured”); id. at 34 (asserting that Arar had "a right to petition the [relevant court] to enjoin his removal to a country that would torture him”). We need not explore this issue, however, because, as set forth below, Arar has not established that defendants' conduct amounted to interference with a constitutional right; and violation of a “constitutionally recognized interest” is a necessary element of a Bivens claim, see, e.g., Robbins, 127 S.Ct. at 2598.

. 8 C.F.R. § 235.8(a) reads as follows:
When an immigration officer or an immigration judge suspects that an arriving alien appears to be inadmissible [on security and related grounds], the immigration officer or immigration judge shall order the alien removed and report the action promptly to the district director who has administrative jurisdiction over the place where the alien has arrived or where the hearing is being held. The immigration officer shall, if possible, take a brief sworn question-and-answer statement from the alien, and the alien shall be notified by personal service of Form 1-147, Notice of Temporary Inadmissibility, of the action taken and the right to submit a written statement and additional information for consideration by the Attorney General. The district director shall forward the report to the regional director for further action as provided in paragraph (b) of this section.

. 8 U.S.C. § 1362 states that:
In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose.

. 8 U.S.C. § 1225(c) sets out procedures for the removal of aliens who have been deemed inadmissible "on security and related grounds.” Subsection 1225(c)(3) provides that, in the case of an alien who falls within the ambit of section 1225(c), "[t]he alien or the alien’s representative may submit a written statement and additional information for consideration by the Attorney General.”

. 8 U.S.C. § 1225(b)(1)(B) sets forth procedures relating to asylum interviews. Subsection 1225(b)(l)(B)(iv) provides that "[a]n alien who is eligible for [an asylum] interview may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General. Such consultation shall be at no expense to the Government and shall not unreasonably delay the process.”

. Judge Sack emphatically proclaims that this is not "an immigration case,” see Dissent 202, and contends that the majority is incorrect to "treat[] Arar[] ... as though he were an unadmitted alien,” id. at 205. Specifically, Judge Sack takes the position that, in regarding Arar as an unadmitted alien, the majority incorrectly "treats Arar as though he was an immigrant seeking entry into the United States.” Id. at 206 n. 21; see also id. at 206 (taking the position that Arar cannot properly be treated "for immigration purposes, as though he had been held or turned back at the border” because Arar was not "seeking to immigrate to the United States”) (emphasis omitted).
This represents a mischaracterization of the majority’s approach, as well as the relevant law and regulations. Arar’s intention, or lack thereof, to immigrate to the United States is irrelevant to the question of whether he was an admitted or unadmitted alien. The INA defines "[t]he terms ‘admission’ and ‘admitted’ [to] mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.” 8 U.S.C. § 1101(a)(13)(A); see also id. § 1101(a)(4) (“The term ‘application for admission' has reference to the application for admission into the United States and not to the application for the issuance of an immigrant or nonimmi-grant visa.”) (emphasis added). At the time that the events described in this complaint took place, individuals who, like Arar, were eligible to transfer flights through the United States without obtaining a visa first, see 8 C.F.R. § 1212.1(f)(1) (describing the "transit without visa” program) were nevertheless subject to "the full border inspection process upon arrival in the U.S.,” see Press Release, Department of Homeland Security, Homeland Security and Department of State Take Immediate Steps To Make Air Travel Even Safer (Aug. 2, 2003), available at http://www. dhs.gov/xnews/releases/press — release—0227. shtm (last visited June 11, 2008).
Accordingly, it is clear that (1) in subjecting himself to inspection upon arrival at JFK, Arar sought admission to the United States for purposes of the INA; and (2) because the immigration officer refused to authorize Arar’s entry into the United States, Arar was not "admitted” for purposes of the INA. In sum, there is no basis — legal or factual — for the criticisms offered by our colleague in his partial dissent.

. Our colleague, in his partial dissent, also asserts that Arar’s legal status as an unadmit-ted alien is irrelevant to any analysis of Arar’s constitutional claims. This is plainly incorrect. The Supreme Court — both recently and in the past — has looked to the legal status of aliens under immigration law when considering petitions challenging the confinement of these aliens under the Due Process Clause of the Fifth Amendment. See, e.g., Zadvydas, 533 U.S. at 690, 121 S.Ct. 2491 (identifying the issue under consideration to be whether the "indefinite detention of an alien” violates "[t]he Fifth Amendment's Due Process Clause” and beginning the analysis of the claim brought by noting that ‘‘[t]he distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law”). In Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953), for example, the Court considered the petition of an alien challenging the Attorney General's ability to detain him "without notice of any charge against him and without opportunity to be heard in opposition thereto.” Id. at 595, 73 S.Ct. 472. The Court observed that, "[f]or purposes of [ascertaining] [the petitioner’s] constitutional right to due process,” it was required to take into account that the petitioner’s legal status was that "of an alien continuously residing and physically present in the United States.” Id. at 596., 73 S.Ct. 472 As the Court explained:
"The Bill of Rights is a futile authority for the alien seeking admission for the first *187 time to these shores. But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment.”
Id. at 596 n. 5, 73 S.Ct. 472. With respect to the relevance of an alien's legal status, Judge Sack distinguishes between claimed violations of ''procedural” due process, where he concedes that status is relevant, and "substantive” due process, where he maintains that status is not. In view of the fact that Judge Sack does not offer any supporting authority from the Supreme Court or our Court — nor are we aware of any — we decline to disregard binding precedent that takes account of an alien’s status when considering the scope of that alien’s due process rights.

. Arar was removed pursuant to 8 U.S.C. § 1182(a)(3) (removability on security and related grounds) under the procedures set forth in 8 U.S.C. § 1225(c); subsection 1225(c)(2)(B) provides that:
If the Attorney General (i) is satisfied on the basis of confidential information that the alien is inadmissible ... and (ii) after consulting with appropriate security agencies of the United States Government, concludes that disclosure of the information would be prejudicial to the public interest, safety, or security, the Attorney General may order the alien removed without further inquiry or hearing by an immigration judge.

. We note that Arar’s allegation that he "was never given a meaningful opportunity to contest [the] finding” that he belonged to Al Qaeda, Compl. ¶ 38, constitutes a "legal conclusion[] couched as [a] factual allegation[],” Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir.2007).

. Judge Sack disagrees with our decision to evaluate Arar’s substantive due process claims under the standard that Arar himself proposes, characterizing the Supreme Court's *190 analysis in Wolfish as "unhelpful” because Arar "was not a pre-trial detainee.” Dissent 207 n. 24. Accordingly, we are puzzled to note that Judge Sack elects to base his conclusion that a Bivens action should be available to Arar on two courts of appeals decisions relating to the rights of pretrial detainees: Iqbal v. Hasty, 490 F.3d 143 (2d Cir.2007), cert. granted sub nom. Ashcroft v. Iqbal, - U.S. -, 128 S.Ct. 2931, - L.Ed.2d -, 76 U.S.L.W. 3417 (U.S. June 16, 2008) (No. 07-1015) and Magluta v. Samples, 375 F.3d 1269 (11th Cir.2004). See Dissent 209-10, 210-11.